Larry L. Kreis v. Commissioner.
Kreis v. Commissioner
Docket No. 4709-69 SC.
United States Tax Court
T.C. Memo 1970-175; 1970 Tax Ct. Memo LEXIS 184; 29 T.C.M. (CCH) 770; T.C.M. (RIA) 70175; June 24, 1970, Filed Larry L. Kreis, pro se, 944-11th Ave., Anchorage, Alas. RichardSeltzer, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent *185 determined a deficiency of $707.66 in petitioner's income tax for the year 1967. The deficiency arose from a determination by respondent that an amount of $2,590.00 received by petitioner constituted compensation for services rendered and therefore was gross income to him under section 61, [1] I.R.C. 1954 rather than, as petitioner contends, an amount received "as a scholarship" or "as a fellowship grant" excludable from gross income under section 117. Findings of Fact Most of the facts have been stipulated and we find them to be as stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. At the time his petition was filed in this case petitioner resided in Arlington, Virginia. Petitioner filed his 1967 income tax return with the district director of internal revenue, Cincinnati, Ohio. During 1967, petitioner was enrolled in a program leading to a Master of Arts degree at Ball State University in Muncie, Indiana. Simultaneously, he was also enrolled at Ohio State University taking graduate courses. The credits received *186 for the course completed satisfactorily at Ohio State University could be applied to meet the requirements for a Master's degree from Ball State. On his 1967 income tax return petitioner reported that he had received $2,590.00 from Richland County, Ohio. He excluded that amount from income on his return. He received that amount while he was serving as a graduate research assistant under the direction of Dr. Nason Hall of the Sociology Department at Ohio State University. Petitioner received the $2,590.00 in 1967 due to his participation in a research project known as "Prevent Delinquency, Underachievement and Dropout" (D.U.D.). This project was initiated during the summer of 1966 by the Richland County, Ohio, School Board at the request of seven school superintendents. The seven school superintendents requested a study of the causes of school dropouts in rural communities. The project was subsequently expanded to include the study of the causes of underachievement and delinquency among school age children. The project was headed by Mr. Richard Porter for the Richland County School Board. He requested consulting services and staff assistance from Ohio State University. The consulting *187 services were supplied by Jack Frymier, Ph.D., of the Department of Education and Nason Hall, Ph.D., of the Department of Sociology each of Ohio State University. With the cooperation of Doctors Frymier and Hall, the Richland County School Board obtained a grant from the United States Office of Education under the Elementary and Secondary Education Act of 1965 to fund the project, which the Board placed in a bank account maintained either in its own name or in the name of the County and from which petitioner and other members of the project staff were paid. [2]
Doctors Frymier and Hall considered three factors in agreeing to participate in the project: that Ohio State University should provide University service to Richland County; that the project was relevant to the interests of Doctors Frymier and Hall; and that the project would be important to the education of graduate students participating in it. As a general rule in a well-developed graduate program, it is important that the students participate in a variety of educational activities *188 beyond formal course work. One such activity is working as a teaching assistant. Another is participation in a research project so that the student receives experience in performing research. As a general rule graduate departments strive to provide their students with a balance of these types of experience. Doctors Frymier and Hall would not have participated in the project unless the data and information studied were relevant to 772 their own interests and the interests of the graduate students who might participate. The project was staffed by five graduate students from Ohio State University. The five graduate students were selected by Doctors Frymier and Hall from seven or eight applicants. The students had to be candidates for graduate degrees at Ohio State University to be eligible to participate in the project. They were selected on the basis of a personal interview, their prior academic record, letters of recommendation, and primarily, the likelihood that they would complete their education with a Doctor of Philosophy degree. Three of the students were from the Department of Sociology at Ohio State University and two were from the Department of Education. Two of the three *189 students from the Department of Sociology were candidates for the degree of Master of Arts, and the remaining three students were candidates for the degree of Doctor of Philosophy. It was understood that the project was for a limited period of time. Participation by the five graduate students began with the beginning of the Fall Quarter, 1966, of the Ohio State academic year, and continued for about one year. To coordinate and direct the project, frequent meetings were held during the first month. The duties of the graduate students consisted of theoretical formulations, research of the literature, formulation of hypotheses, preparation and administration of questionnaires, compelation of data, placing data on IBM cards, analysis of data and assisting in the writing of the report. Each student was expected to perform those duties for an average of twenty hours per week for the duration of the project. Petitioner did not prepare the questionnaires used in connection with the School Board project. He prepared the questionnaires used in connection with his Master's thesis. He administered the latter to students interviewed at the same time he administered the questionnaires used in *190 connection with the School Board project. The final report on the project was prepared by Dr. Hall after petitioner had left Ohio State. Working hours were not supervised, and no written records were kept of the time put in by each student. However, the students were paid monthly for twenty hours of work per week by checks drawn by the School Board or by an official of the County acting on its behalf on a bank account into which the funds received by the School Board from the United States Office of Education of the Department of Health, Education and Welfare had been deposited. Richland County withheld income tax from petitioner's "wages" which was reported to the Internal Revenue Service on Form W-2. Each graduate student participating in the project was a candidate for a degree the requirements for which included the submission of a satisfactory thesis. Four of the students participating in the D.U.D. project used the results of the D.U.D. research in the preparation of theses submitted to satisfy degree requirements; one did not, although he intended to do so when he first became associated with the project. One of the requirements for the degree of Master of Arts from Ball *191 State University was that candidates submit a satisfactory thesis. There was no requirment that a candidate for the degree of Master of Arts from Ball State University perform any compensated services amounting to part-time employment. Petitioner was not required to perform any compensated research services to qualify for the degree of Master of Arts from Ball State University. As prearranged with Dr. Hall, the petitioner was allowed to do his own research while participating in the project. Petitioner used the results of his own research performed while participating in the project in the preparation of the thesis he submitted at Ball State University in satisfaction of the requirements for the degree of Master of Arts. This thesis, titled "Academic Achievement and the Authoritarianism Anomia Syndrome," had as its subject of inquiry the relationship, if any, between authoritarianism or anomia or both to the underachievement or overachievement of students, male, female, or both. The data used by and analyzed in his own research was derived from a questionnaire prepared by him and one other research assistant from Ohio State and administered to over 100 eleventh grade students who *192 were among those questioned in connection with the Richland County School Board project. The questionnaire contained 33 statements. The student questioned was asked to indicate his agreement or disagreement in a space before each statement. In order to exemplify the general character of the 773 statements in this questionnaire we set out in the margin [3] the first 16 of the 33 statements. *193 The work on petitioner's thesis was completed after the project report was submitted and the results of petitioner's work on his thesis topic were not included in the project report. Opinion KERN, Judge: The question in this case is whether petitioner can exclude from his taxable income under the provisions of section 117, I.R.C. 1954, [4] amounts received by him from Richland County, Ohio in payment for service rendered by him to the Richland County School Board in connection with a research project organized at the request of the School Board officials by two professors at Ohio State University who consented to engage in this work for several reasons, one of which was to create employment as research assistants for 774 qualifed students (including petitioner) at the University who were candidates for graduate degrees. *194 In his brief petitioner states his position to be "that the project was of mutual benefit to him and to the Richland County School Board and that the stipend in question is excludable from petitioner's gross income." This position seems predicated on a contention to the effect that the payments constituted a scholarship or fellowship grant in that, although the research for which he was paid was for the benefit of the governmental entity making the payments to him, the principal reason for his selection by the Ohio State professors as one of the research assistants to work on this project was to further his education, to make it possible for him to carry on his own personal research required for the preparation of his Master of Art's thesis and to provide money which would in some part defray the expenses of his graduate work at the University. While these objectives were prominently in the minds of the University professors who arranged or "worked up" the project on behalf of the Richland County School Board, they constituted no part of the considerations which interested the officials of the School Board who were concerned, not with the education of petitioner, but with the problems *195 of delinquency, underachievement and drop-outs among the students of the County's public schools and with how to cope with them, and because of their interest in these problems and the possible answers were willing to pay for the research which they authorized, including the remuneration paid to petitioner. It may have been understood that a large part of the work incident to the project would be done by research assistants of the two professors chosen by them from graduate students at the University who were themselves interested in the general field of inquiry related to by the project. However with no sense of reality could it be said that the payments made by the School Board or the County [5] to petitioner were "relatively disinterested 'no strings' educational grants, with no requirement of any substantial quid pro quo from the recipient." See Bingler v. Johnson, 394 U.S. 741 (1969). This, said the Supreme Court, was "the ordinary understanding" of "scholarships" and "fellowships" and supported the conclusion reached by the Court in that case to the effect that respondent's regulations on this subject (Income Tax Regs. section 1.117-4(c)(1) and (2)) [6] were valid. *196 On the authority of Bingler v. Johnson, supra, we hold that the payments received by petitioner from the School Board and/or the County did not *197 constitute a scholarship as that term is used in the statute, that the payments were made to petitioner in return for his services to the payor, and that they were made for the primary benefit of the payor. [7] See also, Elmer L. Reese, Jr., 45 T.C. 407 (1966), aff'd per curiam 373 F. 2d 742 (C.A. 4, 1967), in which we indicated (at p. 411) that "the primary purpose of the payment must be to further the education and training of the recipient rather than to compensate the recipient for services rendered or to be rendered which directly benefit the payor." In the recent case of Stephen L. Zolnay, 49 T.C. 389 (1968), which also involved a graduate student at Ohio State University, it was held on facts more favorable to the taxpayer than those present in the instant case [8] that the student 775 taxpayer, although able to "combine his studies with activities capable of providing him with financial support" was in reality being paid to work rather than to study and therefore the payments received by him constituted taxable compensation for services rendered rather than payments excludable *198 under section 117. Since we have concluded that the payments to petitioner which are here at issue were not received by him as a scholarship or a grant within the meaning of section 117(a)(1) it is unnecessary for us to consider the contention of the respondent relating to limitations imposed by section 117(b)(1). Petitioner's reliance on Chandler P. Bhalla, 35 T.C. 13 (1960), and an unreported decision of this Court [9] is misplaced. In those cases. payments were made to the taxpayers from the universities in which the taxpayers were degree candidates for research work of a type required by the universities for the granting of such degrees and from funds under their control. In the instant case the payments were made directly *199 to petitioner by an entity having no interest in his education in return for research work of a type not required as a condition for his degree.
Decision will be entered for the respondent. Footnotes
1. Hereafter all section references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. The form W-2 attached to petitioner's return indicates that Richland County was the actual payor of petitioner's "wages" here in question.↩
3. 1. Obedience and respect for authority are the most important virtues children should learn. 2. No weakness or difficulty can hold us back if we have enough will power. 3. Science has its place, but there are many important things that can never possibly be understood by the human mind. 4. Human nature being what it is, there will always be war and conflict. 5. Every person should have complete faith in some supernatural power whose decisions he obeys without question. 6. When a person has a problem or a worry, it is best for him not to think about it, but to keep busy with more cheerful things. 7. A person who has bad manners, habits, and breeding can hardly expect to get along with decent people. 8. What the youth needs most is strict discipline, rugged determination, and the will to work and fight for family and country. 9. Some people are born with the urge to jump from high places. 10. Nowadays when so many different kinds of people move around and mix together so much, a person has to protect himself and be especially careful about catching an infection or disease from them. 11. An insult to our honor should always be punished. 12. Young people sometimes get rebellious ideas, but as they grow up they ought to get over them and settle down. 13. What this country needs most, more than laws and political programs, is a few courageous, tireless, devoted leaders in whom the people can put their trust. 14. Sex crimes, such as rape and attacks on children, deserve more than mere imprisonment; such criminals ought to be publicly whipped, or worse. 15. People can be divided into two distinct classes; the weak and the strong. 16. There is hardly anything lower than a person who does not feel a great love, gratitude and respect for his parents.↩
4. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. - (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e)(4), or (B) as a fellowship grant, including the value of contributed services and accommodations; and (2) any amount received to cover expenses for - (A) travel, (B) research, (C) clerical help, or (D) equipment, which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient. (b) Limitations. - (1) Individuals Who Are Candidates For Degrees. - In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph. (2) Individuals who Are Not Candidates For Degrees. - In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions For Exclusion. - The grantor of the scholarship or fellowship grant is - (i) an organization described in section 501 (c)(3) which is exempt from tax under section 501(a), (ii) a foreign government, (iii) an international organization, or a binational or multinational educational and cultural foundation or commission created or continued pursuant to the Mutual Educational and Cultural Exchange Act of 1961, or (iv) The United States, or an instrumentality or agency thereof, or a State, a territory, or a possession of the United States, or any political subdivision thereof, or the District of Columbia. (B) Extent of Exclusion. - The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educacational institution (as defined in section 151 (e)(4)).↩
5. We consider irrelevant the fact that these funds had been received by the School Board or the County from the Office of Education in the Department of Health, Education and Welfare. ↩
6. Sec. 1.117-4 Items not considered as scholarships or fellowship grants. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of section 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.↩
7. In this case there is properly speaking no "grantor."↩
8. In this case the petitioner made use of the research work performed by him while a student at Ohio State to prepare his thesis which he later submitted as a candidate for the degree of Master of Arts at Ball State University. No such research work was required by Ball State per se, and the payments involved were made directly to petitioner by an entity other than a university as compensation for the work which petitioner did for that entity.↩
9. Lawrence Spruch, 20 T.C.M. 324 (T.C. Memo. 1961-63↩).