Dr. Hollis K. (III) and Patricia D. LEATHERS, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Dr. William F. and June B. BLANKENSHIP, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. LR–70–C–242, LR–70–C–244.

United States District Court, E. D. Arkansas, W. D.

Sept. 7, 1971.

Boyce R. Love and Byron M. Eiseman, Jr., Smith, William, Friday, Eldredge & Clark, Little Rock, Ark., for. plaintiffs.

Eugene G. Sayre, Tax Div., Dept. of Justice, Dallas, Tex., W. H. Dillahunty, U. S. Atty., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, District Judge.

These cases were consolidated for trial for the convenience of the plaintiffs and of some witnesses. Although there are certain differences in the facts of the two lawsuits, there are many similarities, and it is not inappropriate to deal with both of them in the same memorandum.

The plaintiff doctors were resident physicians of the University of Arkansas Medical Center in Little Rock during the time pertinent to the suits. During the calendar year 1969, Dr. Leathers was a resident in pathology. He was paid something over $7,200 by the Medical Center during that year. On the joint income tax return he and his wife filed for 1969, $3,600 of that amount was excluded from income, on the ground that it was paid to Dr. Leathers as a "scholarship" or "fellowship" within the meaning of the Internal Revenue laws and regulations. During 1968, Dr. Blankenship was for six months a resident in surgery and for six months a resident in orthopedics. He spent nine months of the year on duty at the Medical Center and the balance at the Veterans Administration Hospital in Little Rock. He was paid a total of just under $5,000 by the two institutions; of that, he and his wife also excluded $3,600 on their joint return for 1968, again on the ground that that sum represented scholarship or fellowship payments.

The Internal Revenue Service determined that the payments to the two doctors were not scholarships or fellowships, and, therefore, that no part of them should have been excluded from income. The plaintiffs paid the resulting additional tax, filed a timely claim for a refund, and instituted this suit for recovery of the tax within the two-year period after notice that the claims had been disallowed.

The cases were tried to a jury on June 23 and 24, 1971. Each case was submitted on one special interrogatory. The verdict form in the Blankenship case read:

"We, the jury, find that the payments made during the year 1968 to Dr. Blankenship by the University of Arkansas Medical Center and by the Veterans Administration ———— scholarship or fellowship grants within the meaning of the Internal Revenue law and regulations."

The jury foreman was to insert "were" or "were not" in the blank space. The verdict form in the Leathers case was identical except that the name and year were changed and the reference to the Veterans Administration was omitted. The jury found in both cases that the payments were scholarship or fellowship grants. Judgment was entered for both sets of plaintiffs for the amounts of tax sued for, interest, and costs.

The government has filed a motion for judgments notwithstanding the verdicts, or alternatively for a new trial. It lists ten points on which the motion is based. Many of them were specifically ruled on

at trial, but all will be dealt with again here.

■ The government's first point is a conclusory assertion that the verdicts are unsupported by the evidence. It is clearly without merit. There is ample, if not overwhelming, evidence in the record from which the jury could have found that the primary reason for the existence of the University of Arkansas Medical Center is for the training of physicians; that its function as a treating institution is only subordinate to, and supportive of, that primary purpose; that the Medical Center's purpose in accepting doctors for its residency programs is to train them as specialists hoping that they will remain in Arkansas to help meet the great shortage of medical professionals here; that Dr. Leathers' and Dr. Blankenship's personal objectives during the years in question were to further their education and to be trained as specialists; that the payments made to them were made to allow them to pursue studies and advance their training in their individual capacities; that any services rendered to the Medical Center or to patients by the two doctors were only incidentally of benefit to the Medical Center; and that the payments did not represent compensation for services rendered. If the jury found these facts, all of which are amply supported by the evidence, their responses to the special interrogatories were entirely proper.

■ The government's second contention is that the amounts received by Dr. Blankenship from the Veterans Administration Hospital were undisputably compensation for services rendered. By this argument, the government would have the Court ignore the orthopedic residency program as a whole and look only at one three-month segment of it. The jury could have found that the orthopedic residency program was set up at the Medical Center primarily—or exclusively—to provide for the training of orthopedic surgeons, not to provide patient care. The University wanted to train orthopedists and Dr. Blankenship wanted to receive that training. To that end, the University's residency program rotates its trainees, on a regular basis, to the VA Hospital, under an agreement with the VA to cooperate in the program. Though the services performed by Dr. Blankenship may be of incidental benefit to the Veterans Administration, as they almost certainly are, that does not change the fact that the training program is the real reason for the payments. The testimony in the case is to the effect that the VA pays residents the amounts set by the University's schedule of payments, modified to a slight degree not clearly established in the record. The testimony indicates that the VA does *not* make an independent evaluation of the worth of each resident's services, nor does it pay him on such a standard. If there are residents who spend their full time at the VA Hospital, and if they are paid on a scale set by the VA in accordance with the value or worth of their services, then their cases would present a fact situation different from that of Dr. Blankenship.

■ Thirdly, the government complains of the granting of plaintiffs' motion in limine, whereby it was not allowed to adduce evidence of the withholding of state and federal income tax and deduction of FICA taxes from the payments made to the doctors. The laws and regulations which require employers to withhold and deduct these items are entirely separate from those concerning the exclusion of scholarships and fellowships from income, and are therefore irrelevant to the questions at issue in these suits. For that matter, the government surely does not contend that a mistake, if one had been made, on the part of someone paying out money as to the taxability of that money to the payee would now be binding on the payee. The evidence was properly excluded. It was for the jury to make this determination in the light of all the facts upon the basis of the Court's instructions as to the law. It would have been prejudicial to admit such evidence.

■ Next, the government urges that the inclusion of the word "scholarship"

in the instructions to the jury is prejudicial error, as it did at several points during the trial. It is hard to see how the government could have been prejudiced by the word, since it is used in conjunction and apparently interchangeably with the word "fellowship" every time either appears in Treasury Regulations § 1.117–4, the section of the Regulations most crucial to this case. The jury was instructed by use of verbatim excerpts from that section. If there were any real reason for this Court to attempt to distinguish the concept of a "fellowship" from that of a "scholarship" for purposes of the subject matter of this Regulation, it is likely that the Treasury would have drawn some distinction itself. The definitions of the two words set forth in Regulation § 1.117–3 were in fact given in the instructions.

■■ The motion's fifth point is an assertion that an instruction substantially similar to § 61 of the Internal Revenue Code should have been given. That section provides that all income shall be taxable unless specifically excluded, from whatever source the income was derived. Such an instruction was requested at trial. It would, of course, have been an instruction to the jury as to the legal consequences of their answers to the special interrogatories. It may be an express function of a special interrogatory that such extraneous matters be removed from the jury's consideration. See, e. g., Thedorf v. Lipsey, 237 F.2d 190 (7th Cir. 1956); compare Lowery v. Clouse, 348 F.2d 252 (8th Cir. 1965). The jury is asked to find facts; the Court determines the legal effect of those facts. Here, the jury was to determine whether or not the plaintiffs received scholarship or fellowship grants. An instruction informing them of the legal results of their decision would in this case have served no real purpose; and, on balance, the government probably benefited from submission in this manner. At any rate, the matter was discretionary with the Court.

■ Point six is a contention that the acknowledged teaching and supervisory functions performed by residents at the Medical Center required a binding instruction to the effect that the payments were taxable if the residents were required to perform teaching duties in return. The testimony of plaintiffs' witnesses tended clearly to show that any teaching done by the resident is primarily a device to further the training and education of the residents themselves. It would certainly have been a permissible inference for the jury to have concluded that any benefit to the hospital was only incidental. These were matters for the jury's determination.

■ The government's next point attacks the Court's refusal to allow the jury to have in the jury room certain parts of the exhibits to the stipulation received in evidence. The jury, after retiring, asked to see "the exhibits" and the government's attorney asked at that time that all the exhibits to the stipulation be sent to the jury room. It may be that the government is contending in its motion that the Court refused to honor the attorneys' stipulation when it refused to allow the jury to view certain of the exhibits, or that it allowed plaintiffs' attorneys to renege on their part of the stipulation. If this is the government's reasoning, it may be disposed of easily: it was quite apparent at the in-chambers conference on the jury's request that there was no agreement between the parties as to whether all the exhibits should be shown to the jury. Since the stipulation as filed did not deal with this matter on its face, there was no agreement to let the jury view anything prior to that in-chambers conference. It may be, however, that the government believes that the Court is compelled to let the jury view any exhibit introduced at trial, whether the contents thereof were brought to the attention of the jury prior to the submission of the case or not. There is some authority to that effect, see 89 C.J.S. Trial § 466, n. 4, and cases there cited, but the more common rule is that the matter is within the court's discretion. Murray v. United States, 76 U.S.App.D.C. 179, 130 F.2d 442 (1942);

89 C.J.S. Trial § 466 a. In the present case, there was disagreement as to the materiality or possible prejudicial effect of each of the items not sent to the jury. At trial, the Court stated item by item its reasons for not allowing the jury to view all parts of the stipulated exhibits, including the two items referred to again in counsel's brief supporting the motion for a new trial.

The government's point eight is essentially similar to its first one: that the verdicts are not supported by the evidence. The assertion is followed by a listing of the items of evidence favorable to the government's case and by an attempt to discredit evidence favorable to plaintiffs. This point can be sufficiently dealt with by repeating that it was the jury's task to weigh the probative value of the evidence. From ample competent evidence, it could have found that the University of Arkansas Medical Center exists primarily for the training of physicians. The fact that it provides patient care through the University Hospital is a happy, though incidental, side effect. The government seems to be here relying on the conclusion reached by the trial judge in Coggins v. United States, 26 AFTR 2d 70–5775 (N.D.Tex.1970), that the testimony of a hospital administrator was to be given no weight. That may well have been a correct finding in the *Coggins* case, but it is certainly not controlling in the present case. Such a statement made here would be incorrect and would be an invasion of the province of the jury.

The next point is little more than a recital of another item of evidence favorable to the government, a statement that residents have more privileges and perquisites during their time at the Medical Center than do undergraduate medical students. No one disputes the fact that undergraduate students are different in some degree from graduate students. Nor is it seriously disputed that medical education is *sui generis,* a thing unto itself. The relevant question to be answered in these suits, however, is whether these residents were there primarily for purposes of their own education or for purposes of rendering service and treatment.

The government's final point is its repeated contention that the evidence at the trial supported its case rather than the plaintiffs'. There was evidence to support both parties. That evidence was properly submitted to the jury, and the jury considered it and made its decision.

In his brief, counsel for the government adds the assertion that the wording of the special interrogatories was prejudicial to his case, as it did not include a direct statement that the payments could be compensation. The jury was carefully instructed as to burden of proof, and was told at length, using the language of the Treasury Regulations, under what conditions receipts of money would be treated as scholarship or fellowship grants. The instructions made repeated reference to the possibility that the stipends were compensation for services, with a distinction drawn at each mention between that case and the "scholarhip or fellowship" instance, and with the clear indication that the two situations are mutually exclusive. Here, again, the government seems to ignore the fact that the jury may have found only an incidental benefit to the grantor and that such an incidental benefit, if any, does not destroy the character of the amounts paid as scholarships or fellowships.

The brief in support of the government's motion relies for authority on two cases, Wertzberger v. United States, 315 F.Supp. 34 (W.D.Mo.1970), aff'd per curiam, 441 F.2d 1166 (8th Cir. 1971), and Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969). It argues that there is no distinction between the *Wertzberger* case, which was decided for the government, and the present one. This contention is not well taken. There was undoubtedly substantial evidence to support the decision of Judge Oliver sitting as factfinder in *Wertzberger*, and the Court of Appeals so held. Here, too, there is substantial evidence to support the verdicts of the jury. Both cases

involve factual determinations, and both factfinders had a reasonable and substantial basis for their findings.

Bingler v. Johnson upheld the Treasury's regulations concerning fellowships, using the phrases "no-strings-attached educational grant", and "no requirement for any substantial *quid pro quo*" in exchange for the grant. The government is obviously alluding to the asserted obligation that the plaintiff doctors provide patient care and do some teaching of other students. It would have the Court ignore the plaintiffs' contentions that these two functions are integrally and indispensably a part of a specializing physician's training. The jury was certainly free to accept plaintiffs' view of the facts here. If the government means to rely on Bingler v. Johnson for a determination as to the facts of the present cases, that reliance is misplaced. Even a cursory examination of the facts of that case will show the numerous significant differences between it and the cases at hand.

The Court has carefully considered all the points raised by the government in its motion and its brief. It is firmly convinced that none of them justify the granting of a new trial or the awarding of a judgment notwithstanding the verdict. An order denying the motion has been entered.